In the Matter of EAST 56TH PLAZA, INC., Appellant, v NEW YORK CITY CONCILIATION AND APPEALS BOARD, Respondent.

First Department, May 19, 1981

### APPEARANCES OF COUNSEL

*Arthur Richenthal* of counsel *(Richenthal, Abrams & Moss,* attorneys), for appellant.

*William E. Rosen* of counsel *(Ellis S. Franke,* attorney), for respondent.

### OPINION OF THE COURT

SULLIVAN, J.

A narrow question of law is presented as to the interpretation of a provision of the Code of the Real Estate Industry Stabilization Association of New York City (Code). The facts are not in dispute.

Petitioner is the owner of a New York City luxury apartment building in which all of the housing accommodations

are subject to the provisions of the New York City Rent Stabilization Law of 1969. (Local Laws, 1969, No. 16 of City of New York as amd to date by L 1974, ch 576 and subsequent local laws.) On September 27, 1979, it submitted to the Attorney-General of the State of New York a proposed offering plan for converting the building to co-operative ownership. The same day petitioner gave written notice of the filing of such plan to the Rent Stabilization Division of the New York City Department of Housing Preservation and Development (HPD).

Previously, by letter dated July 11, 1979, petitioner, pursuant to section 60 of the Code of the Real Estate Industry Stabilization Association of New York City[1], had offered the tenants of apartment 20B, Mr. and Mrs. Sigmund Schutz, a renewal of their existing lease, which was due to expire on September 30, 1979. In its offer petitioner explained the tenants' options as to the election of an extension of the lease for a term of one, two or three years. Petitioner also enclosed, in triplicate, an unsigned renewal agreement which contained the terms of the proposed renewal lease and provided an appropriate place for the tenants to indicate by their signature the choice of a lease term. The document concluded with the provision "IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written." Spaces for signature by both the landlord and the tenants immediately followed.

The tenants selected a three-year term commencing October 1, 1979 at a monthly rental of $1,059.15, affixed their signatures twice in the appropriate places, and on or about July 28, 1979, returned the renewal agreement in triplicate to petitioner's managing agent with a check for the additional security based upon the increased stabilization rent. Petitioner, however, anticipating the filing of an offering plan for conversion of the building to co-operative owner-

---

1. Section 60 of the Code, as amended April 2, 1979, provides in relevant part: "Every owner shall notify the tenant in occupancy not more than 150 and not less than 120 days prior to the end of the tenant's lease term, by mail, of such termination and offer to renew the lease at a rent not in excess of the stabilization rent permitted for each renewal lease and otherwise on the same conditions as the expiring lease, and shall give such tenant a period of 60 days to renew such lease and accept the offer".

ship and intending in that event, to include in the lease the 90-day cancellation clause authorized by subdivision 7 of section 61 of the Code, did not deposit the tenants' check for the additional security or sign the renewal lease agreement.

On September 28, 1979, the day after the filing of the proposed conversion plan and notice to HPD of such filing, petitioner hand delivered to the tenants the renewal agreement together with a rider containing the 90-day cancellation clause authorized by subdivision 7 of section 61 of the Code. A covering letter requested the tenant to "review, sign the rider and return * * * for further processing and signature of the Landlord." The cancellation clause reads as follows:

"CO-OP CANCELLATION CLAUSE

"The tenant is hereby advised that the owner has submitted a proposed plan of cooperative conversion for the demised premises to the New York State of [sic] Attorney General and that the Department of Housing Preservation and Development has been notified of such submission. In accordance with section 61, sub-section 7 of the Code of the Rent Stabilization Association, owner and tenant agree that owner may cancel this lease upon ninety day notice to tenant that the proposed plan of cooperative conversion has been declared effective."

Thereafter, apparently on October 5, 1979, the tenants signed the rider with the notation "under protest", and returned to petitioner's managing agent both the renewal agreement initialled, also under protest, to show the inclusion of the rider, and the rider. Petitioner immediately signed the renewal agreement and rider and returned an executed copy to the tenants.

The tenants, challenging the validity of the 90-day cancellation clause, thereupon filed a complaint with the New York City Conciliation and Appeals Board (Board). The Board declared the cancellation clause a nullity, finding that subdivision 7 of section 61 of the Code does not permit the insertion of such a clause into the lease after the tenant has been offered and has accepted and signed a renewal agreement which does not contain such a clause. Petitioner

then commenced this article 78 proceeding to vacate the Board's determination. Special Term denied the petition and dismissed the proceeding, a disposition with which we disagree. We would reverse, grant the petition and annul the order and opinion of the Board.

Subdivision 7 of section 61 of the Code provides: "Notwithstanding anything contained herein to the contrary, any renewal or vacancy lease executed after notice to the Department of Housing Preservation and Development that a proposed cooperative or condominium Plan has been submitted to the Attorney General may contain a provision that the lease may be cancelled after 90 days' notice to the tenant that the Plan has been declared effective. In any lease containing such a provision, upon submission of the Plan of cooperative or condominium ownership to the tenant after acceptance for filing by the Attorney General, no increase in rent may be collected thereafter pursuant to said lease. If the Plan is abandoned then the rent will be at the rate set forth in said lease from the date of abandonment." Thus, once notice is given to HPD of the submission of a proposed co-operative plan to the Attorney-General, any vacancy or renewal lease thereafter "executed" may provide for cancellation of the lease after 90 days' notice to the tenant that the plan has been declared effective. Here, submission of the plan and, perforce, notice thereof to HPD, occurred subsequent to the time the tenants had been offered and signed a proposed renewal lease, but before petitioner, as landlord, had signed. Thus, the issue is whether under subdivision 7 of section 61 of the Code a renewal lease which by its terms requires the signatures of both landlord and tenant for its validity is executed when only the tenant has signed the lease. The Board held that the landlord could not insert the 90-day cancellation clause once the tenant had signed the renewal lease, thereby ruling, in effect that the lease was executed when the tenants alone signed. In our view this determination is contrary to law.

A lease or other bilateral contract which, as here, provides for the signature of both parties is "executed" only when it is signed by both parties and delivered. (See *219 Broadway Corp. v Alexander's, Inc.*, 46 NY2d 506.) "[I]f

the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed." *(Scheck v Francis*, 26 NY2d 466, 469-470.) As already noted, the renewal agreement contained a signature place for both "Landlord" and "Tenant", immediately following the provision "IN WITNESS WHEREOF, the parties have executed this Agreement". Obviously execution of the lease contemplated a signing by both parties.

In *219 Broadway Corp. v Alexander's, Inc.* (46 NY2d 506, 511, *supra)*, the Court of Appeals had occasion to re-iterate a fundamental principle relating to the making of a lease: "A lease * * * requires the fulfillment by the parties of certain prerequisites to take effect. It is the well-established rule in this State that delivery is one such requirement, the absence of which, without more, renders the lease ineffective."

Special Term's attempt to distinguish *219 Broadway* on the ground it involved "commercial property not bound by the Rent Stabilization Code" is unavailing. Rent stabilization affects the substantive content of leases but in no way purports to change well-established principles relating to the requisites for execution of leases. Whether commercial or residential, and if residential, rent stabilized, or free from statutory controls, a written lease agreement[2] requires the formalities of signature by both parties for its proper execution.

Nor do we find any basis for an administrative interpretation of "executed", as that term is used in subdivision 7 of section 61 of the Code, different from the established meaning ascribed to it by legal precedent. The language of subdivision 7 of section 61 of the Code, "any renewal or vacancy lease executed after notice," could not be clearer. "Statutory language which is plain and unambiguous should be construed in its natural and most obvious sense." *(Matter of Fullerton v General Motors Corp.*, 46 AD2d 251,

---

2. Whether an alleged lease agreement satisfies Statute of Frauds requirements (see General Obligations Law, § 5-703) is not at issue here, because no lease agreement was ever reached.

252; McKinney's Cons Laws of NY, Book 1, Statutes, §§ 94, 232.) In construing the Rent Stabilization Law or the Code, in the absence of express provision otherwise, the settled meaning of a term should control. As one court has noted in considering terms used in the Workmen's Compensation Law: "[T]hese words have a distinct and well-defined meaning in the jurisprudence of the State, and must be deemed to have the same meaning when used in the statutes." *(Matter of Skeels v Paul Smith's Hotel Co.*, 195 App Div 39, 42.)

In ignoring the explicit language of subdivision 7 of section 61 and the settled meaning of the term "executed" as that term applies to bilateral written contracts, and in disregarding the format and "execution" clause of the renewal agreement, the Board effectively rewrote subdivision 7 of section 61 to read not "any renewal or vacancy lease executed after notice" but rather "if prior to the signing by the tenant of any renewal or vacancy lease notice has been given."

Moreover, the Board's interpretation of subdivision 7 of section 61 is inconsistent with its prior determinations. In at least two earlier opinions the Board sanctioned and approved the owner's insertion of a Code section 42 (subd [b])[3] rider after the tenant had signed the proposed renewal lease but before the owner had signed it. The Board justifies the departure from precedent in the instant case by pointing out that a section 42 (subd [b]) rider concerns rent increases while a section 61 (subd 7) rider effects changes in the duration of the lease term. It concludes, therefore, that a 42 (subd [b]) clause has "finite parameters", permitting a change to another stabilized rent,

---

3. Subdivision (b) of section 42 permits the inclusion in a renewal lease of a rider providing for rent increases in specified situations. In pertinent part subdivision (b) of section 42 reads:

"(b) Any lease may contain a clause which provides for an increase in the stabilization rent during the term of said lease on one of the following conditions:

"(1) pursuant to an order of the CAB or the Rent Guidelines Board;

"(2) that owner and tenant have agreed to be bound by any determination on the CAB affecting the tenancy during the term of said lease; provided, however, that nothing herein shall limit the right of the parties hereto to judicial review".

while the 90-day cancellation clause "deprives the tenant of the certainty of lease protection altogether." This is a distinction without legal significance. The amount of rent and the duration of a lease term have equal importance under the Rent Stabilization Law. Surely, a tenant's ability to pay an increased rent affects his certainty of lease protection. Furthermore, subdivision (c) of section 54, in specifying those clauses which an owner may impose on a tenant as a condition to the offer of a renewal lease, does not differentiate between a section 42 (subd [b]) rider and a 61 (subd 7) rider.

In justifying their interpretation of the term "executed" as used in subdivision 7 of section 61, both the Board and Special Term rely, in part, upon section 60 of the Code. Under this section an owner must, not more than 150 days and not less than 120 days before the expiration of the current lease, notify the tenant of his right to renew at a rent not in excess of the lawful stabilization rent permitted for such renewal. As the Board concedes, however, neither section 60 nor any other provision of the Code requires that the renewal lease be tendered or signed during this period.[4] Notice by mail of termination and offer to renew suffices. Had petitioner, on July 11, 1979, merely mailed a notification of expiration and offer to renew and delayed tender of a renewal lease containing the cancellation rider until September 28, 1979 (after submission of its co-operative plan to the Attorney-General and notice thereof to HPD), it would still have been in full compliance with section 60. Yet, in such circumstances the tenants would have received no greater notice of the inclusion of the 90-day cancellation rider than was given here. We fail to see why petitioner should be penalized merely because the renewal agreement which it had tendered earlier had already been signed by the tenants by September 28, 1979, as long as it, by not signing, had not completed execution of the document.

Moreover, both the Board and Special Term misconstrue

---

4. No prejudice ensues to the tenant if the owner delays in submitting the proposed renewal lease because section 42 (subd [a], par [1]) of the Code provides that an increase over the stabilization rent in an expiring lease may not be collected by the owner unless "the owner and tenant have entered into a valid written renewal or vacancy lease."

the function of section 60. Within the time limits specified the owner must "offer to renew the lease at a rent not in excess of the stabilization rent permitted for each renewal lease and *otherwise on the same conditions as the expiring lease*". (Emphasis added.) The clear thrust of the section is to provide the tenant a specified minimum period of time in which to decide whether to renew at the new lawful stabilization rent. But the notice provisions of section 60 do not apply to a change in lease terms to include a 90-day cancellation rider because offers of renewal made pursuant to it, except for the rent increase, must be "on the same conditions as the expiring lease". Thus, sections 60 and subdivision 7 of 61, while compatible, are autonomous. Appealing as it may be, Special Term's finding that "[p]ermitting a major alteration of the renewal lease, already signed by the tenant, just two days before the expiration of the old lease's term would not be in keeping with the intent of section 60" unfortunately ignores the section's specific language, which does not provide for any change in the lease terms, except for rent, irrespective of whether notice of inclusion of the cancellation clause was given to the tenant within the time limits of section 60 or before the tenant signed the lease.

Section 60 should be recognized for what it is, a notice procedure for increasing a tenant's rent on renewal. It does not concern itself at all with execution of the lease. On the other hand, subdivision 7 of section 61 applies to "any renewal or vacancy lease executed after notice". Surely, a vacancy lease calling for a signature by both parties is not executed under subdivision 7 of section 61 until signed by both owner and tenant. Since the Legislature did not intend disparate treatment between a vacancy and renewal lease as to the interpretation of the word "executed" a renewal lease should not be subject to a different interpretation.

Finally, we conclude that this is not an instance where due deference should be accorded the Board's construction of a statute. The meaning of the "lease executed" provision of subdivision 7 of section 61 is purely a question of law, not involving the Board's special expertise. As the Court of Appeals has noted: "Where, however, the question is one of pure statutory reading and analysis, dependent only on

accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency and its interpretive regulations are therefore to be accorded much less weight. And, of course, if the regulation runs counter to the clear wording of a statutory provision, it should not be accorded any weight." *(Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451, 459.) Similarly, in *Matter of Caraballo v Community School Bd. Dist. 3* (49 NY2d 488, 494) the Court of Appeals, citing *Kurcsics,* held that the Commissioner of Education's interpretation of the Education Law "is not to be slavishly followed when it 'runs counter to the clear wording of a statutory provision' ".

Nor may an administrative agency give its own regulation an unreasonable interpretation. *(Matter of Abraham & Straus v Tully,* 47 NY2d 207, 214.) We are not, however, concerned here with an administrative agency's interpretation of its own regulations. The Code was adopted by the Rent Stabilization Association, not the Board, with the approval of HPD. Subdivision 7 of section 61 of the Code is authorized in *haec verba* by the New York City Rent Stabilization Law, as amended (Administrative Code of City of New York, tit YY), which requires that the Code to be approved by HPD contain such provision. (Administrative Code of City of New York, § YY 55-6.0, subd b, par [2]; subd c, par [9], cl [f]; see L 1946, ch 274, § 1 *et seq.,* as amd.) Thus, the Board did not promulgate the Code and it may not change the plain meaning of its provisions to produce a desired result. The Legislature has provided the tenants with a *quid pro quo* for the inclusion of the 90-day cancellation clause in the lease. Subdivision 7 of section 61 provides that "[i]n any lease containing such a provision, upon submission of the Plan of cooperative or condominium ownership to the tenant after acceptance for filing by the Attorney General, no increase in rent may be collected thereafter pursuant to said lease." The Board's strained interpretation is not consonant with the fair accommodation and balancing of interests between landlord and tenant which subdivision 7 of section 61 accomplishes. (See *Halperin v 2 Fifth Ave. Co.,* 75 AD2d 565.)

To justify its conclusion that, notwithstanding the absence of the landlord's signature on the lease instrument, an enforceable agreement conveying a leasehold interest was reached, the dissent treats the July 11, 1979 letter and the accompanying proposed unsigned lease together as an offer requiring nothing further on the landlord's part, and argues that under general contract principles a bilateral contract was entered once the tenants signed the lease. The facts do not support such a conclusion.

The letter of July 11, 1979 was clearly a form letter of transmittal. Rather than summarize its contents, we set forth its text in full:

## WILLOWICK

### Management

400 East 56th Street      New York, N.Y. 10022

July 11, 1979

Dear . . .  . . . . . . . . . . . .  . . . . . . . . . . . . . ,

Enclosed is Renewal Agreement in triplicate. The increments for your rent are regulated by the Rent Stabilization Law of 1969. That Law also provides that one may elect to extend his lease for a 3-year term at 15%, a 2-year term at 12% or 1-year term at 8½%.

Please note that the Agreement must be signed in TWO PLACES:

(1)    On the first page indicating your selection of term, and

(2)    On the last page where indicated. This must be done on ALL sets of the Agreement.

IT IS NECESSARY THAT THESE DOCUMENTS BE RETURNED TO US AS SOON AS POSSIBLE, along with a check covering your additional security deposit as outlined in paragraph 2 of the document. This check should be drawn to the order of:

*WILLOWICK MANAGEMENT CORP.*

Your tenancy is sincerely appreciated and we hope that you will continue to reside in the building.

Sincerely,

WILLOWICK MANAGEMENT CORP.

EVELYN COPELAND
Assistant Manager

EC/ac
Encl:

· Prior to the mailing of this letter no discussions or negotiations regarding a renewal had taken place. Thus, we find inapplicable the principle, relied upon by the dissent, that where the parties have agreed upon all the substantial terms of a contract a more formal writing is not necessary for a binding contract, even though the parties may intend to memorialize their agreement by execution of such a writing. (See *Matter of Municipal Consultants & Publishers v Town of Ramapo*, 47 NY2d 144.) Here, no prior oral agreement had been reached. The mailing of the letter with the proposed lease was the first communication between the parties concerning renewal.

Our conclusion that a lease was not executed until both parties signed the lease instrument is premised not merely on the presence of space on that instrument for the signature of both parties. Petitioner's own actions in preparing a letter and a lease; in signing the letter but not the lease; and in requiring all the documents to be returned rather than permitting the tenants to hold a copy, as would have been proper if the lease was to be executed upon the tenants' signatures, all support the conclusion that petitioner had not already bound itself. No act, unequivocal or otherwise, is present from which one can conclude that petitioner endowed the tenants with the legal power to create a binding contract simply by signing the lease. Indeed, by withholding its signature from the lease when it prepared the lease and the letter, petitioner clearly evinced an intention to reserve for itself the power to complete execution of the contract upon return of the lease signed by the tenants. As long as it is reasonably apparent that some further act of the offeror is necessary, the offeree has no power to create a contractual relation by an act of his own, and there is as yet no operative offer. (1 Corbin, Contracts, § 11, p 25.) This is no

less true because a landlord is obligated to offer a renewal lease[5] under the Code. Moreover, the tenants clearly understood this by returning all three copies of the lease, rather than retaining a copy for themselves. "In determining whether the parties entered into a contractual agreement * * * it is necessary to look * * * to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds". *(Brown Bros. Elec. Contrs. v Beam Constr. Corp.,* 41 NY2d 397, 399.)

Thus, the true tenor of the July 11 letter was the proffering of a renewal to take effect upon the execution of the enclosed lease instrument, rather than a written commitment, *in praesenti,* to convey a leasehold interest. The signed July 11 letter, viewed by itself or in tandem with the unsigned renewal agreement, did not create the relationship of landlord and tenant for a renewal term nor did it vest any estate or interest as long as it contemplated the execution of a formal lease to complete the contract. (See *Schwartz v Greenberg,* 304 NY 250; *Harvey v General Cable Corp.,* 1 AD2d 79, affd 2 NY2d 986.)

While obligated, pursuant to section 60 of the Code, to offer to renew within 150 to 120 days before a lease's expiration, a landlord is not required to submit a written lease within any specified period.[6] And if, as here, a written renewal lease instrument is tendered within that time span, the landlord may also withhold execution of the written lease, because it may wish to reserve its rights, including the right to take advantage of a conversion plan filing with the Attorney-General, and in accordance with the Code,

---

5. Renewal lease is defined as "[a]ny extension after May 31, 1968 of a tenant's lawful occupancy of a dwelling unit after the completion of his lease term, including, but not limited to a written extension of an existing lease or the execution of a new lease for the same space". (Code of the Real Estate Industry Stabilization Assn. of New York City, § 2, subd [s]; Administrative Code of City of New York, § YY51-6.0.) The definition thus contemplates other means of extending the lease, presumably including oral extensions as well as holdovers resulting from the landlord's failure to offer a written renewal.

6. While the Code definition of "Renewal Lease" is broad enough to encompass even an oral extension of an existing lease or lawful occupancy (§ 2, subd [s]), the stabilization rent may be increased only if the owner and tenant have entered into a valid written renewal lease (§ 42). Such is the case here as the proposed renewal lease contemplated increases in accordance with the rent guidelines.

add a section 61 (subd 7) rider. We see no reason, under either contract law or statute, why it should be denied that right.

The situation here is similar to that found in *Queens Bonnie Co. v Brittain* (40 AD2d 876). There, the landlord had transmitted proposed leases which did not contain a so-called "tax clause" to a number of tenants, who signed the leases in the form submitted and returned them to the landlord. The landlord then inserted a "tax clause" in the leases, signed and sent them back to the tenants. The tenants retained the leases and paid the relatively small share of the real estate tax increase in the first year, but balked at the heftier increase in the second year. The court upheld the validity of the tax clause, finding that the "landlords' action in adding a tax clause to the leases while the parties were still in process of negotiating constituted a counter-offer to the proposals otherwise contained in the instruments signed by the tenants." *(Queens Bonnie Co. v Brittain, supra,* p 877.) The court found acceptance in the tenants' retention of the revised leases. It concluded (p 877) that if the tenants "were not bound by the tax clause, they would have had no written leases at all." This is precisely the case here. Until it signed the lease petitioner could avail itself of its rights and insert a 90-day cancellation clause.

The dissent's reliance upon *Century Operating Corp. v Prince* (NYLJ, March 6, 1978, p 11, cols 1-2, affd 66 AD2d 1032) for the proposition that the tenants' signature created a binding contract is misplaced. In *Century,* which involved a Statute of Frauds issue because the landlord never signed the lease, the crucial fact was the landlord's retention of the deposit, a factor unequivocally referable to part performance of the lease. Here, petitioner refrained from depositing the tenants' check for the additional security.

Accordingly, the judgment, Supreme Court, New York County (TYLER, J.), entered October 24, 1980, dismissing the petition should be reversed, on the law, without costs or disbursements, and the petition granted.

FEIN, J. (dissenting). The pertinent facts are fairly stated in the majority opinion.

In my view the threshold issue determinative of this

appeal is whether a binding and enforceable contract, in this case a lease between a landlord and tenant, came into existence prior to the landlord's attempt to include in the lease a provision permitting the landlord to terminate the lease on 90 days' notice pursuant to the filing of an offering plan for conversion of the building to co-operative ownership authorized by subdivision 7 of section 61 of the Code of the Real Estate Industry Stabilization Association of New York City (Code).

A bilateral contract which is required to be in writing becomes an enforceable agreement when it is evidenced by writings signed by both parties. It is not essential to validity that the signatures of both parties be appended to one instrument so long as the writings accurately identify the parties and reflect and contain all of the pertinent terms of the agreement. A letter offer and a letter acceptance will suffice *(Sanders v Pottlitzer Bros. Fruit Co.*, 144 NY 209). Although as the majority notes, the Statute of Frauds (General Obligations Law, § 5-703) is not at issue here, this principle applies even where the statute is applicable. To satisfy the statute the instrument or instruments relied upon need only be signed by "the party to be charged". It is now sought to impose upon the tenant a provision he never agreed to, when he signed the instrument (see *Geraci v. Jenrette*, 41 NY2d 660; *Genesee Mgt. v Del Bello*, 60 AD2d 779).

Here, as required by the Rent Stablization Law of 1969, as amended (Administrative Code of City of New York, tit YY) and section 60 of the Code, the landlord prepared a proposed lease and forwarded it to the tenant with a letter signed on behalf of the landlord constituting an offer. It was no less an offer in contemplation of law because the landlord of the rent stabilized apartment was required to make such offer. The majority suggests that the letter was merely a form letter of transmittal. That it was an offer is clear from the text of the letter, and from the mandatory language of section 60 of the Code: *"Every owner shall* notify the tenant in occupancy not more than 150 and not less than 120 days prior to the end of the tenant's lease term, by mail, of such termination and *offer to renew the lease* at a rent not in excess of the stablization rent permitted

for each renewal lease and otherwise on the same conditions as the expiring lease, and shall give such tenant a period of 60 days to renew *such lease and accept the offer*".

This was the only communication from the landlord to the tenant. Within the time limit the tenant accepted the offer by executing the lease and returning it to the landlord together with the additional security required because of the rent increase. Thus, by ordinary principles of contract law, an enforceable contract was created *(Richards v Levy, 40 AD2d 1055)*. There was a written offer and a written acceptance. It is undisputed that the terms were the terms offered by the landlord, and it is undisputed that the tenant accepted them. It is equally undisputed that it was then the intention of both parties to enter into a binding lease on those terms and conditions. The failure of the landlord to execute and return an executed copy of the lease to the tenant could not terminate the contract thus made between the parties *(Century Operating Corp. v Prince*, NYLJ, March 6, 1978, p 11, cols 1-2 [Bloom, J.], affd 66 AD2d 1032; *Beach Haven Apts. No. 6 v Levy*, 103 Misc 2d 747). Nor could the landlord's subsequent unilateral insertion of a Code (§ 61, subd 7) provision impair the obligations of the existing contract. *Queens Bonnie Co. v Brittain* (40 AD2d 876) cited by the majority is distinguishable. There the landlord inserted a tax escalation clause in the leases after their execution by the tenants and sent them back to the tenants signed by the landlord. The tenants paid the tax the first year but refused to pay the higher tax the next year. The court held that the landlord's action was a "counter offer" accepted by the tenants. There was no such acceptance here.

*219 Broadway Corp. v Alexander's, Inc.* (46 NY2d 506) relied upon by the majority, is not to the contrary. In that case the tenant executed a proposed lease purporting to embody a prior oral agreement between the parties. The tenant forwarded that lease to the landlord who failed and refused to deliver an executed copy. The landlord then leased the property to another. The tenant sued, alleging in its complaint upon information and belief that the landlord had "executed the said lease" and hence there was

an enforceable agreement. On a motion to dismiss the complaint for failure to state a cause of action, the Court of Appeals held that no cause of action was stated because plaintiff failed to allege and manifestly could not prove that there was a delivery of the lease by the landlord. Indeed, plaintiff's very action was premised upon the failure to deliver the executed lease. The Court of Appeals ruled that since the fundamental purpose of a lease is to convey an interest in real property, it is requisite that a signed instrument be delivered by the landlord (46 NY2d, at p 512).

This has nothing to do with our problem. The issue here is not delivery. However, instructive for our purposes is the court's statement (46 NY2d, at p 512) that it is enough if there be "acts or words or both acts and words which clearly manifest that it is the intent of the parties that an interest in the land is, in fact, being conveyed to the lessee." It is undisputed here that the landlord signed the offer and transmitted it and the proposed lease to the tenant who signed and delivered the signed lease to the landlord. It is plain that what was intended was to convey an interest in the land. The Court of Appeals expressly declined to deal with the problem here presented because there was no necessity to do so. The court stated (46 NY2d, at p 513): "Nor do we reach or consider the broad question whether, and in what circumstances, signature alone will suffice to create an enforceable contract."

Relying upon the fact that the lease contains a signature place for both the landlord and tenant, the majority concludes that validity and execution depend upon signing by both parties where indicated, citing Scheck v Francis (26 NY2d 466). In that case the Court of Appeals stated: "It is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed." (26 NY2d, at p 469-470.) However, in that case, it was clear that none of the contract documents had been signed. The letter relied upon was merely a transmittal letter by one of the lawyers advising the parties as to the method and manner of execution if the agreements were proper in form and substance. However, where the parties

have exchanged communications containing all the terms of their agreement, enforcement will not be denied because they intended to execute a more formal agreement *(Sanders v Pottlitzer Bros. Fruit Co.,* 144 NY 209, *supra;* see *Matter of Municipal Consultants & Publishers v Town of Ramapo,* 47 NY2d 144).

In our case the letter from the landlord is not a transmittal letter by a lawyer. It is the offer executed on behalf of the landlord as required by the statute and the Code. Even if the statute and Code did not prescribe the form of the offer, the communication by the landlord would plainly be deemed a binding offer by ordinary contract principles. There was no need for prior oral agreement, as suggested by the majority. All the terms were included in the letter and proposed lease. There was nothing to negotiate. The acceptance creating a bilateral contract was the mailing of the lease bearing the tenant's signature together with the deposit. This court has so held *(Century Operating Corp. v Prince, supra;* see, also, *Beach Haven Apts. No. 6 v Levy, supra).* In *Century Operating Corp.,* the managing agent for the landlord mailed the tenant a renewal lease in conformity with prior oral negotiations. The covering letter requested the tenant to transmit a check for the increase in security. The tenant mailed an executed copy of the lease together with his check for the additional security to the agent. The lease was held to be enforceable although no executed copy was returned by the successor landlord who had acquired the premises in the interim.

It is bootless to argue that signatures by both the landlord and tenant on the lease proper are required because space is provided for such signatures. It is well settled that where a writing is required, either by statute or the understanding of the parties, the signatures are sufficient to bind if they are affixed to separate documents which clearly identify the transaction and contain all of the terms upon which the parties have agreed and indicate an intention to be bound *(Crabtree v Elizabeth Arden Sales Corp.,* 305 NY 48; *Scheck v Francis, supra).* Only where there remains something to negotiate will integration be denied *(Brause v Goldman,* 10 AD2d 328, affd 9 NY2d 620; *Sanders v*

*Pottlitzer Bros. Fruit Co., supra).* Nothing remained for negotiation when the landlord made the signed written offer of a renewal lease to the tenant. When the tenant signed and returned the lease there was an executed agreement. That there was a contract is demonstrated by "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds". *(Brown Bros. Elec. Contrs. v Beam Constr. Corp.,* 41 NY2d 397, 399.) Nothing remained to be done to create a binding contract.

The landlord and the majority assert that well-settled principles require signing by both parties on the lease proper before there is an "executed" agreement. *Schwartz v Greenberg* (304 NY 250) cited by the majority does not so hold. There each party retained his own signed copy of the proposed agreement. Defendant refused to turn over his copy until after he had torn off his signature. Since there was never a delivery of a signed agreement, it was held there was no contract. This is in accord with the well-settled principle that where there is a delivery of a signed written offer and a signed written acceptance there is a contract. It has been "executed". This is the lesson of *Harvey v General Cable Corp.* (1 AD2d 79, affd 2 NY2d 986) also cited by the majority. (See *Newburger v American Sur. Co.,* 242 NY 134, 144.) It is undisputed that this is what occurred here. Thus the discussion concerning the meaning of the word "executed" as that term is used in subdivision 7 of section 61 of the statute and the Code does not advance our analysis. The obvious intention of the regulation is to insure that no section 61 (subd 7) cancellation provision may be included in a lease after landlord and tenant have entered a binding agreement.

I concur with the majority that "[s]tatutory language which is plan and unambiguous should be construed in its natural and most obvious sense." *(Matter of Fullerton v General Motors Corp.,* 46 AD2d 251, 252.) A construction of the word "executed" which would ignore well-settled principles of contract law as to the execution of a bilateral contract would do violence to that principle.

It may well be that the Board's determination that there

was an executed agreement here is inconsistent with its prior determinations respecting the owner's inclusion of a Code section 42 (subd [b]) rider after the tenant had signed the proposed renewal lease but before the owner had signed it. We are not now required or invited to pass on those decisions. In any event, they are not binding upon this court.

The majority asserts that if the landlord had merely mailed a notification of expiration and offer to renew and delayed a tender of a renewal lease containing the cancellation rider until after the submission of its co-operative plan to the Attorney-General and notice thereof to the New York City Department of Housing Preservation and Development, the landlord would be protected, even if the tenant had accepted the offer before receipt of the notice of inclusion of the 90-day cancellation order. I know of no authority to such effect and none is cited. Had a tenant in such circumstances accepted the offer to renew, there may very well have been a binding and enforceable agreement not subject to change by either party. We need not decide that issue today.

Thus we need not concern ourselves with the measure of deference to be accorded to an administrative agency's construction of a statute or of its own regulations. The majority seems to suggest that there is a difference depending upon whether what is being administered is a statute or the agency's own regulations. No authority is cited for this view. The same principle applies whether the agency is applying a statute it is required to administer or a regulation written by the agency.

Finally, I agree with the majority that section 60 should be recognized for what it is: in my view, a provision requiring a landlord *to offer* a renewal lease to stabilized tenants on the same terms and conditions as the expiring lease except for an increase in rent within fixed parameters, subject to acceptance by the tenant by execution of the tendered lease and payment of the increased security. To reject its plain meaning by a strained interpretation of the word "executed" in subdivision 7 of section 61 would ignore or reject a basic principle of contract law, the creation of a

bilateral contract by the exchange of writings, a written offer and a written acceptance, subdivision 7 of section 61 is applicable only prior to the acceptance by the tenant. This interpretation does no violence to the statute and Code or to well-settled contract principles.

The majority, as does the landlord, seems concerned with the possibility that a different result might ensue with respect to vacancy leases. We need not decide that issue today, although I perceive no reason why the same rules should not apply.

Judgment, Supreme Court, New York County (TYLER, J.), entered October 24, 1980 dismissing the petition, should be affirmed.

SANDLER, J. P., and CARRO, J., concur with SULLIVAN, J.; ROSS and FEIN, JJ., dissent in a separate opinion by FEIN, J.

Judgment, Supreme Court, New York County, entered on October 24, 1980, reversed, on the law, without costs and without disbursements, and the petition granted.