**LITTON INDUSTRIES, INC., Plaintiff,**

v.

**LEHMAN BROTHERS KUHN LOEB INCORPORATED, Dennis Levine, Ira B. Sokolow, Robert M. Wilkis, Bank Leu International, Ltd., Bank Leu A.G., Bernhard Meier, John R. Lademann, Bruno Pletscher, Jean–Pierre Fraysse, and Christian Schlatter, Defendants.**

No. 86 Civ. 6447 (JMC).

United States District Court,
S.D. New York.

June 4, 1991.

Reargument Denied, Opinion
Corrected Aug. 7, 1991.

Dilworth, Paxson, Kalish & Kauffman, Washington, D.C. by Michael I. Smith, Lawrence D. Berger, Scott R. Shepherd and M. Miller Baker, for plaintiff Litton Industries, Inc.

Fried, Frank, Harris, Shriver & Jacobsen, Washington, D.C. by Henry A. Hubschman, for defendants Bank Leu Intern., Ltd. and Bank Leu A.G.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City by Martin Flumenbaum and Brad S. Karp, for defendant Dennis Levine.

Willkie, Farr & Gallagher, New York City by Jeanne M. Luboja, Jonathan P. Wolfert, Jonathan D. Bassett and Michael H. Ochs, for defendant Lehman Bros. Kuhn Loeb Inc.

## MEMORANDUM AND ORDER

CANNELLA, District Judge.

Litton's motion for partial summary judgment is denied. Fed.R.Civ.P. 56. Lehman Brothers' cross-motion for partial summary judgment is granted in part and denied in part. Fed.R.Civ.P. 56. Litton's motion to strike the reply affidavit of Judith MacDonald is denied. Fed.R.Civ.P. 6(d), 56(e); Local Civil Rule 3(c)(2). Litton's motion for the entry of final judgment is granted. Fed.R.Civ.P. 54(b). The joint motion by Litton, BLI, and BLZ for the entry of final judgment is denied. Fed. R.Civ.P. 54(b). Litton's motion to reverse or modify Magistrate Judge Gershon's denial of its renewed motion to compel the deposition testimony of Dennis Levine is denied. 28 U.S.C. § 636(b)(1)(A) (1988); Fed.R.Civ.P. 72(a).

## BACKGROUND

This substantial and complex securities litigation is one of the first civil actions to be filed following the Securities and Exchange Commission's [the "SEC"] well publicized charges that Dennis Levine wrongfully misappropriated inside information. Thus, it is not surprising that this matter has generated a protracted pretrial motion practice. The action has been before the Court on numerous prior motions and, therefore, complete familiarity with the facts is assumed. Nevertheless, a brief review of the underlying facts and extensive procedural history is crucial to a proper understanding of the instant motions.

This action arises out of plaintiff Litton Industries, Inc.'s ["Litton"] successfully negotiated acquisition of Itek Corporation ["Itek"] in January 1983. On September 20, 1982, defendant Lehman Brothers Kuhn Loeb Inc. (now known as Shearson Lehman Brothers) ["Lehman Brothers"] made an initial presentation to Litton concerning possible acquisition candidates in the electronic warfare industry, including Itek. Thereafter, the Litton Board of Directors decided to attempt a friendly takeover of Itek. On October 15, 1982, as a first step toward a possible tender offer, Litton began to purchase Itek stock in the open market. In order to establish a firm toehold in Itek, Litton set out to purchase in the open market 4.9% of the outstanding Itek common stock. In early November 1982, Litton informed Lehman Brothers that it wanted to hire Lehman Brothers as its investment banker for the possible acquisition of Itek.

On November 12, 1982, Lehman Brothers sent a letter to Litton proposing terms for its engagement by Litton. The letter stated that it shall become a binding agreement when executed by Litton. Litton reviewed the letter with its general counsel and thereafter requested certain modifications by Lehman Brothers. On November 23, after incorporation of the modifications, Joseph Casey, Litton's chief financial officer, executed the letter. The agreement, marked "CONFIDENTIAL" on each page, delineates the investment banking services to be rendered by Lehman Brothers and expressly provides that it "represents the entire understanding between the parties, and all other prior discussions and negotiations are merged in it."

The gravamen of Litton's third amended complaint is that defendant Ira B. Sokolow, an employee in Lehman Brothers' mergers and acquisitions department, leaked confidential information regarding Litton's pro-

posed Itek acquisition to defendant Levine, also an employee in the mergers and acquisitions department. It is undisputed that Levine conducted massive amounts of trading based on material nonpublic information during his employment at Lehman Brothers. In particular, the complaint alleges that Levine purchased 50,000 shares of Itek stock through defendant Bank Leu International Limited (now known as Leu Trust and Banking (Bahamas) Limited) ["BLI"] in advance of the public disclosure of Litton's tender offer. The complaint also alleges unlawful open market purchases of Itek common stock by defendants Sokolow, Jean–Pierre Fraysse (BLI's managing director), Bernhard Meier and Christian Schlatter (BLI employees), Robert Wilkis (investment banker with Lazard Freres & Company), and BLI itself. Nontrading defendants who allegedly assisted Levine in his insider trading include Bank Leu A.G. ["BLZ"], John R. Lademann (BLI board member and BLZ management board member), and Bruno Pletscher (BLI's managing director). Although Litton is satisfied with its acquisition of Itek and does not seek to undo the transaction, it contends that defendants' illegal purchases artificially inflated the market price of Itek common stock, thereby causing Litton to pay more than it should have to acquire its toehold purchases of Itek stock in the open market and to complete its tender offer for and subsequent merger with Itek.

The third amended complaint asserts ten counts for various violations of the federal securities laws and RICO, as well as violations of state statutory and common law. Litton asserts the following four measures of damages: (1) against all defendants for the amount Litton overpaid for its tender offer and merger purchases of Itek common stock as a result of the artificial inflation in the market price allegedly caused by defendants' illegal trading [the "tender offer/merger purchase damages"]; (2) against all defendants for the amount Litton overpaid for its open market purchases of Itek common stock on November 19 and 22, 1982 as a result of defendants' illegal trading [the "open market purchase damages"]; (3) against Levine, Sokolow, Wilk-is, Fraysse, Schlatter, Meier, and BLI for disgorgement of all profits, fees, and commissions earned as a result of their illegal trading [the "disgorgement damages"]; and (4) against Lehman Brothers, in the approximate amount of $2.4 million, for the return of all fees paid to Lehman Brothers under their contract for services relating to the Itek acquisition [the "fee damages"]. In connection with its common law claims, Litton also seeks punitive damages against all defendants.

*Dismissal of Litton's Claims for Tender Offer/Merger Purchase Damages*

Defendants initially moved for partial summary judgment on all counts to the extent they sought tender offer/merger purchase damages. By Memorandum and Order dated March 27, 1989, the Court granted defendants' motion, finding as a matter of law that Litton failed to establish a causal connection between defendants' insider trading and the price Litton paid for Itek common stock during the tender offer and subsequent Litton/Itek merger. *See Litton Indus., Inc. v. Lehman Brothers Kuhn Loeb Inc.,* 709 F.Supp. 438 (S.D.N.Y.1989) [the "March 27 Order"]. Based on the Court's finding of no causation, Lehman Brothers moved for partial summary judgment on those counts asserted against it to the extent they sought to recover tender offer/merger purchase damages. By Memorandum and Order dated August 4, 1989, the Court granted the motion, relying principally upon the March 27 Order. *See* Memorandum and Order, at 4–7, 86 Civ. 6447 (JMC), 1989 WL 162315 (S.D.N.Y. Aug. 4, 1989) [the "August 4 Order"].

Thereafter, Litton moved for certification of the March 27 Order pursuant to 28 U.S.C. § 1292(b). The defendants opposed the motion and cross-moved for the entry of final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. The August 4 Order denied both motions, finding that the dismissed claims seeking tender offer/merger purchase damages were not properly the subject of an interlocutory appeal. The August 4 Order also

denied Litton's motion for reconsideration and vacatur of the March 27 Order.

*Dismissal of Litton's Claims for Disgorgement Damages*

■ Defendants BLZ, BLI, Lademann, Pletscher, Schlatter, Fraysse, and Levine moved for partial summary judgment on Litton's securities fraud claim seeking disgorgement of all profits, fees, and commissions earned on the purchase and sale of Itek common stock. By Memorandum and Order dated April 18, 1990, as modified on June 27, 1990, the Court granted the motion as to all defendants except Levine, finding as a matter of law that Litton is not entitled to a disgorgement measure of damages because these defendants previously disgorged to the SEC the full amount of their trading profits from the purchase and sale of Itek securities. *See Litton Indus., Inc. v. Lehman Brothers Kuhn Loeb Inc.,* 734 F.Supp. 1071 (S.D.N.Y.1990) [the "April 18 Order"], *modified,* Memorandum and Order, at 2–3, 86 Civ. 6447 (JMC) (S.D.N.Y. June 27, 1990) [the "June 27 Order"]. As to Levine, the Court found that a genuine issue of material fact existed as to whether the amount previously disgorged to the SEC constituted all illegal profits realized by Levine.

■ Litton seeks disgorgement damages against the trading defendants as an alternative remedy to its tender offer/merger purchase damages and its open market purchase damages. As a result of the April 18 Order as modified, the disgorgement measure of damages remains against only Levine and the trading defendants who did not move for summary judgment—Sokolow, Wilkis, and Meier. However, given the summary judgment dismissal of the tender offer/merger purchase damage claims and the subsequent settlement and dismissal of the open market purchase damage claims, Litton cannot establish liability for securities fraud. Therefore, the demand for trading profits against Levine, Sokolow, Wilkis, and Meier is no longer viable. The remedy of disgorgement cannot create liability for securities fraud, but rather acts as an alternative measure of damages once liability and resulting out-of-pocket damages have been established.

*Dismissal of Litton's Claims for Open Market Purchase Damages*

Litton, BLI, and BLZ entered into a settlement agreement whereby Litton agreed to seek dismissal with prejudice of its claims for open market purchase damages asserted against all defendants in exchange for certain payments from BLI and BLZ. By Memorandum and Order dated June 27, 1990, the Court dismissed with prejudice pursuant to Rule 41(a)(2) the claims asserted against all defendants for open market purchase damages. *See* June 27 Order, at 3–4.

*The Remaining Claims*

The complaint has been dismissed as to all defendants except Lehman Brothers. As to Lehman Brothers, the complaint asserts claims for federal securities fraud, negligence, breach of contract, and breach of fiduciary duty. These claims have been dismissed to the extent they seek to recover tender offer/merger purchase damages and open market purchase damages. The only remaining theory of recovery for each of Litton's claims against Lehman Brothers is fee damages. In connection with its claim for breach of fiduciary duty, Litton also seeks punitive damages.

There are presently six motions pending before the Court. First, Litton moves for partial summary judgment on its claims against Lehman Brothers for breach of contract and breach of fiduciary duty to the extent they seek fee damages. Second, Lehman Brothers cross-moves for partial summary judgment on all counts asserted against it to the extent they seek fee damages. Third, Litton moves to strike the reply affidavit of Judith MacDonald submitted by Lehman Brothers in connection with its cross-motion for partial summary judgment. Fourth, Litton moves for the entry of final judgment pursuant to Rule 54(b) or, in the alternative, for certification for appeal pursuant to 28 U.S.C. § 1292(b) (1988), on its claims for tender offer/merger purchase damages dismissed by the March 27 Order and the August 4 Order, as

well as its claims for disgorgement damages dismissed by the April 18 Order. Fifth, Litton and defendants BLZ and BLI jointly move for the entry of final judgment under Rule 54(b) on the claims for open market purchase damages dismissed by the June 27 Order. Lastly, Litton moves to reverse or modify Magistrate Judge Gershon's denial of its renewed motion to compel the deposition testimony of Levine.

## DISCUSSION

### I. *Cross–Motions for Summary Judgment*

#### A. Breach of Contract

■ Litton contends that Lehman Brothers breached an essential term of its contract with Litton by failing to maintain the confidentiality of all information concerning Litton's plans to acquire Itek. Specifically, Litton alleges that the breach of contract occurred "on or prior to November 12, 1982" when Sokolow leaked Litton's acquisition plans to Levine while acting within the scope of his employment in Lehman Brothers' mergers and acquisitions department. *See* Third Amended Complaint, at ¶¶ 26, 27. Based upon this alleged breach of contract, Litton seeks to recover as damages the fee paid to Lehman Brothers for its services. The motion and cross-motion for summary judgment present three distinct issues: (1) whether a contract existed at the time of the alleged breach on November 12, 1982; (2) if so, whether the contract imposed an obligation upon Lehman Brothers to maintain the confidentiality of Litton's plans to acquire Itek; and (3) assuming breach of an existing contract, whether Litton is entitled to the return of its fee as a restitutionary measure of damages.

The essential elements of an action for breach of contract under New York law are (1) formation of a contract between the parties, (2) plaintiff's performance, (3) defendant's failure to perform, and (4) resulting damages to plaintiff. *See Posner v. Minnesota Mining & Mfg. Co.*, 713 F.Supp. 562, 563 (E.D.N.Y.1989); *Stratton Group, Ltd. v. Sprayregen*, 458 F.Supp. 1216, 1217

(S.D.N.Y.1978). It is axiomatic that to prevail on a claim for breach of contract, a plaintiff must establish the existence of an enforceable contract at the time of the alleged breach.

Notwithstanding the fact that Litton executed the November 12 engagement letter on November 23, Litton argues that a valid, enforceable contract existed by November 12 because the parties reached an oral understanding as to the terms of the agreement. In this regard, Litton contends that by November 12 the parties had completed their negotiations over the essential elements of the contract and that performance had begun on the good faith understanding that unsettled matters would be resolved when the agreement is reduced to writing. Lehman Brothers, however, contends that a binding contract did not arise until Litton signed the November 12 engagement letter on November 23.

■ The executed written contract provides that the agreement shall be construed in accordance with New York law. Under New York law, if the parties do not intend to be bound by an agreement until it is reduced to writing and signed, there is no binding contract until the formal document is executed. *See Scheck v. Francis*, 26 N.Y.2d 466, 469–70, 311 N.Y.S.2d 841, 843, 260 N.E.2d 493, 494 (1970); *East 56th Plaza, Inc. v. New York City Conciliation & Appeals Bd.*, 80 A.D.2d 389, 392–93, 439 N.Y.S.2d 361, 364 (1st Dep't 1981). On the other hand, where the parties have agreed on the substantial terms of a contract but have not yet reduced their agreement to writing, the contract is binding when the oral agreement is made even though the parties contemplate memorializing their agreement in a formal document. *See Municipal Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 148–49, 417 N.Y.S.2d 218, 219–20, 390 N.E.2d 1143, 1144–45 (1979). Ultimately, the intent of the parties determines when enforceable legal rights arise from contract negotiations.

The Second Circuit has delineated four principal factors to determine whether the

conduct of the parties manifests an intention to be bound in contract at some point prior to the execution of a written instrument: (1) whether a party reserved the right not to be bound absent a written agreement, (2) whether all terms of the contract have been agreed upon, (3) whether there has been partial performance of the alleged contract, and (4) whether the alleged agreement concerns complex business matters that ordinarily are reduced to writing. *See Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75–76 (2d Cir.1984). The Court must balance all of these factors, as no single factor is determinative. *See R.G. Group*, 751 F.2d at 75. In balancing these factors, "[w]hat matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances." *Id.* at 74.

### 1. *Express Reservation*

Where a party expressly reserves the right not to be bound by an agreement absent a signed writing, "[c]ourts are reluctant to discount such a clear signal, and it does not matter whether the signal is given during the course of bargaining, or at the time of the alleged agreement." *Id.* at 75. The Second Circuit has repeatedly recognized that mutual intent not to be bound prior to execution of a formal document is established when neither party takes exception during the course of bargaining to language in a draft agreement providing that the agreement will be binding when executed and delivered. *See, e.g., Winston*, 777 F.2d at 81; *R.G. Group*, 751 F.2d at 76; *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). Consistent with this principle, this district recently held that no binding contract exists prior to execution where the draft agreement provided that "[t]his letter, *when countersigned by you,* shall constitute our understanding until a more formal agreement is prepared." *Elvin Assocs. v. Franklin*, 735 F.Supp. 1177, 1182 (S.D.N.Y.1990) (emphasis added); *see*

*also Chrysler Capital Corp. v. Southeast Hotel Properties Ltd. Partnership*, 697 F.Supp. 794, 801 (S.D.N.Y.1988), *aff'd mem.*, 888 F.2d 1376 (2d Cir.1989).

In the instant action, the November 12 engagement letter signed by Lehman Brothers contains unequivocal language referring to its validity upon execution. Specifically, the concluding paragraph provides as follows: "If the foregoing correctly sets forth the understanding and agreement between [Lehman Brothers] and [Litton], please so indicate in the space provided for that purpose below, *whereupon this letter shall constitute a binding agreement.*" (Emphasis added.) It is beyond peradventure that both parties reserved the right not to be bound prior to execution of the letter. Moreover, Litton has submitted no evidence that any party objected to this mutual reservation of rights. Thus, the Court accords "considerable weight" to the express reservation in the November 12 engagement letter not to be bound absent execution by Litton. *See R.G. Group*, 751 F.2d at 75.

### 2. *Context of the Negotiations and Terms Left to be Agreed Upon*

The opening sentence of the November 12 engagement letter states that the letter "will confirm the understanding and agreement" between Lehman Brothers and Litton. It is disingenuous for Litton to argue that this confirmatory language shows that the parties fully negotiated the terms of their engagement and that execution of the letter was purely ministerial. The record clearly establishes that the parties did not negotiate all terms of their engagement prior to receipt of the letter and that Litton itself did not believe there was a prior understanding between the parties. First, it is undisputed that Litton requested certain modifications to the November 12 engagement letter, including deletion of a provision requiring it to indemnify Lehman Brothers. Second, and most significantly, Litton's current position that all material terms of the contract had been agreed to by November 12 is belied by the unambiguous testimony of Joseph Casey, Litton's

chief financial officer who negotiated the contract with Lehman Brothers. Casey testified that upon receipt of the November 12 engagement letter, in Litton's view there was no prior understanding as to the terms of the proposed agreement. *See* Deposition of Joseph T. Casey, at 293–94, 86 Civ. 6447 (JMC) (S.D.N.Y. Aug. 5, 1987) ["Casey Deposition"]. In addition, both Litton's chairman and its general counsel testified that Litton did not retain Lehman Brothers until sometime after the November 15 meeting between the parties. *See* Deposition of Fred W. O'Green, at 377, 86 Civ. 6447 (JMC) (S.D.N.Y. July 17, 1987); Deposition of Robert H. Lentz, at 164–65, 86 Civ. 6447 (JMC) (S.D.N.Y. Aug. 6, 1987). Based upon the uncontroverted testimony of various Litton officers, it cannot be said that "there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to." *R.G. Group*, 751 F.2d at 76.

Litton's reliance on the deposition testimony of Steven Schwarzman, a Lehman Brothers managing director, fails to create a genuine issue as to whether the parties had agreed to the essential terms of the proposed engagement by November 12. Schwarzman simply testified that once Lehman Brothers has a business understanding as to the nature of the deal, it is not crucial to promptly mail the engagement letter. *See* Deposition of Steven A. Schwarzman, at 88, 86 Civ. 6447 (JMC) (S.D.N.Y. Apr. 19, 1990). Schwarzman's testimony, however, does not consider whether in fact *these parties* agreed to all of the essential terms and left nothing to negotiate.

### 3. Partial Performance of the Alleged Agreement

■ Partial performance of the alleged contract by one party coupled with acceptance by the party disclaiming the contract is compelling proof of mutual assent to the essential contract terms despite the absence of a formal written document. "[P]artial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts per-formance signals, by that act, that it also understands a contract to be in effect." *R.G. Group*, 751 F.2d at 75–76. Mere preparatory acts, however, do not constitute partial performance. *See id.; Shearson Lehman CMO, Inc. v. TCF Banking & Sav.*, 710 F.Supp. 67, 71 (S.D.N.Y.1989).

■ Litton cursorily asserts that Lehman Brothers commenced performance of its engagement prior to the leak by Sokolow to Levine and the resultant Itek stock purchases by Levine on November 12. Litton, however, has failed to point to any facts in the record which would indicate partial performance prior to execution of the document on November 23. Litton correctly observes that in early November Casey told Schwarzman that Litton was in the process of acquiring a 4.9% interest in Itek through open market purchases and that Litton wanted to engage Lehman Brothers as its investment banker for the proposed acquisition. *See* Casey Deposition, at 166–68. These acts, however, are merely preparatory acts that conferred no value to Lehman Brothers and, therefore, do not rise to the level of partial performance.

### 4. Scope and Complexity of the Alleged Agreement

This factor looks to whether "the agreement concerns those complex and substantial business matters where requirements that contracts be in writing are the norm rather than the exception." *R.G. Group*, 751 F.2d at 76. Litton's payment of approximately $235 million to acquire Itek and Lehman Brothers' fee of 1% of the total purchase price plus out-of-pocket expenses strongly suggest that the parties contemplated a written agreement. *See id.* at 77; *Shearson Lehman CMO*, 710 F.Supp. at 73; *Mellencamp v. Riva Music Ltd.*, 698 F.Supp. 1154, 1168 (S.D.N.Y.1988). Given the complexity and financial magnitude of the transaction, "a requirement that the agreement be in writing and signed simply cannot be a surprise to anyone." *R.G. Group*, 751 F.2d at 77. Indeed, as a practical business matter, it would be highly unusual for an investment

banking firm to rely on an oral understanding when advising a client as to potential corporate acquisitions.

In a contract action, "summary judgment is perforce improper unless the terms of the agreement are 'wholly unambiguous.'" *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir.1985) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975)). The question of when contractual obligations arise may be resolved as a matter of law on a motion for summary judgment where the intent of the parties is readily determinable from their words and deeds. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989); *Enercomp, Inc. v. McCorhill Publishing, Inc.*, 873 F.2d 536, 546 (2d Cir.1989). Viewing the evidence in the light most favorable to Litton, the pertinent factors conclusively establish that the parties did not intend a contractual obligation to exist prior to Litton's execution of the November 12 engagement letter. Therefore, the Court finds as a matter of law that a binding contract did not arise until Litton executed the engagement letter on November 23, well after the date of the alleged breach on November 12.[1]

Litton's position that the parties intended the November 12 engagement letter to memorialize their prior oral understanding is unsupported by the record. Although the November 12 letter contains basic confirmatory language that under some circumstances may suggest preliminary assent by the parties, binding contractual obligations do not arise where the parties have unambiguously manifested an intent not to be bound absent a signed agreement. It is axiomatic that a party opposing a motion for summary judgment may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Rather, a party opposing summary judgment "must provide 'concrete particulars' showing that a trial is needed, and '[]it is not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to that motion.'" *R.G. Group*, 751 F.2d at 77 (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)). Litton, however, has failed to provide the necessary concrete particulars to establish a genuine issue for trial concerning contract formation.

Accordingly, Lehman Brothers' cross-motion for partial summary judgment to dismiss the breach of contract claim for fee damages is granted. Fed.R.Civ.P. 56. Litton's motion for partial summary judgment is denied. Fed.R.Civ.P. 56.[2]

### B. Breach of Fiduciary Duty

Count X of the third amended complaint asserts a claim against Lehman Brothers for breach of fiduciary duty. Litton alleges that the conduct underlying its breach of contract claim also constitutes a breach of fiduciary duty—Lehman Brothers' failure to prevent Sokolow's disclosure of the Itek acquisition to Levine on or before November 12.[3]

Litton contends that the fiduciary duty arose from the contract between the par-

---

**1.** Litton's contention that the continuing nature of Lehman Brothers' breach precludes a finding that the alleged breach preceded formation of the contract is without merit. The complaint alleges that the breach of contract—Lehman Brothers' failure to maintain the confidentiality of Litton's plans to acquire Itek by permitting Sokolow to leak the material, nonpublic information to Levine—occurred on or before November 12, 1982. *See* Third Amended Complaint, at ¶¶ 26, 27. The purchases of Itek common stock by Levine and others after the November 23 contract formation date is irrelevant.

**2.** Given the absence of a binding contract at the time of the alleged breach, the Court need not consider whether the contract imposes a duty of confidentiality upon Lehman Brothers or whether Litton is entitled to the return of its fee as a restitutionary measure of damages.

**3.** In this regard, the complaint alleges that "[t]he dissemination of confidential and proprietary information from and through Lehman, its employees, agents and representatives, constituted a breach of the fiduciary duty which Lehman owed to Litton." Third Amended Complaint, at ¶ 105; *see also id.* at ¶¶ 26–27 (discussing Sokolow's leak of the confidential Itek acquisition).

ties.[4] However, as previously established, no contract existed between Litton and Lehman Brothers until November 23. Therefore, even assuming that by entering into the contract Lehman Brothers undertook fiduciary obligations toward Litton, Lehman Brothers could not have done so until November 23 at the earliest. Since Litton alleges that breach of the contractually-derived fiduciary duty occurred on or prior to November 12, the absence of a fiduciary relationship necessarily precludes liability for breach of fiduciary duty. Accordingly, Lehman Brothers' motion for summary judgment on the fiduciary duty claim is granted to the extent that Litton alleges breach of a contractually-derived fiduciary duty.

■ Litton's complaint can be broadly read to assert that a fiduciary duty arose from the business relationship between the parties independent of their contractual relationship. Certainly, tort liability for breach of fiduciary duty may be predicated upon the precise conduct which also constitutes a breach of contractual obligations. *See Meyers v. Waverly Fabrics*, 65 N.Y.2d 75, 80 n. 2, 489 N.Y.S.2d 891, 894 n. 2, 479 N.E.2d 236, 239 n. 2 (1985); *Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50, 55, 529 N.Y.S.2d 279, 281–82 (1st Dep't 1988); *Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 167–68, 521 N.Y.S.2d 672, 676 (1st Dep't 1987). However, the existence of a fiduciary duty is not coterminous with a contractual obligation. Rather, the proper "focus is on whether a noncontractual duty was violated; a duty imposed on individuals as a matter of social policy, as opposed to those imposed consensually as a matter of contractual agreement." *Apple Records*, 137 A.D.2d at 55, 529 N.Y.S.2d at 282.

Although the existence of fiduciary relationships under New York law cannot be determined by recourse to rigid formulas, New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first. *See id.* at 57, 529 N.Y.S.2d at 283; *Penato v. George*, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900, 904 (2d Dep't 1976), *appeal dismissed*, 42 N.Y.2d 908, 397 N.Y.S.2d 1004, 366 N.E.2d 1358 (1977). *See generally United States v. Reed*, 601 F.Supp. 685, 703–18 (S.D.N.Y.) (providing a detailed review of fiduciary relationships at common law), *rev'd in part on other grounds*, 773 F.2d 477 (2d Cir.1985) (reinstating perjury and obstruction of justice counts). Under New York law, " '[a] fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.' " *Mandelblatt*, 132 A.D.2d at 168, 521 N.Y.S.2d at 676 (quoting *Restatement (Second) of Torts* § 874 comment a (1979)). Thus, broadly stated, a fiduciary relationship " 'is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another ... [and] might be found to exist, in appropriate circumstances, between close friends or even where confidence is based upon prior business dealings.' " *Apple Records*, 137 A.D.2d at 57, 529 N.Y.S.2d at 283 (quoting *Penato*, 52 A.D.2d at 942, 383 N.Y.S.2d at 904–05 (citations omitted)).

■ As a general matter, the mere reposal of confidential information in and of itself will not give rise to a fiduciary relationship under New York law. *See King v. Edward B. Marks Music Corp.*, 45 N.Y.S.2d 630, 633 (Sup.Ct.1943). The confidence reposed by one party must be accepted by the other party. *See* 36A C.J.S. *Fiduciary*, at 385 (1961). In the absence of such mutuality, "[t]he mere unilateral

---

**4.** With respect to the contractually-derived fiduciary duty, the complaint alleges as follows:
 101. By the agreement dated November 12, 1982, labelled "Confidential," which memorialized Litton's and Lehman's understandings, Lehman undertook fiduciary obligations toward Litton in connection with the acquisition of Itek.

102. For a consideration from Litton which ultimately exceeded $2,300,000, Lehman agreed to and did undertake to keep confidential all information concerning Litton's plans as to Itek and, in that regard, to safeguard the confidentiality of such information as a fiduciary.
Third Amended Complaint, at ¶¶ 101, 102.

investment of confidence by one party in the other ordinarily will not suffice to saddle the parties with the obligations and duties of a confidential relationship." *Reed,* 601 F.Supp. at 715. In addition, there must be a nexus between the reposed confidence and the confidential relationship. As the New York Court of Appeals has recognized:

> It is well established, as a general proposition, that a person who acquires special knowledge or information *by virtue of* a confidential or fiduciary relationship with another is not free to exploit that knowledge or information for his own personal benefit but must account to his principal for any profits derived therefrom.

*Diamond v. Oreamuno,* 24 N.Y.2d 494, 497, 301 N.Y.S.2d 78, 80, 248 N.E.2d 910, 912 (1969) (emphasis added). Thus, the confidential relationship must predate the reposal of trust or confidence and thereby "provide the context—if not the impetus—for such disclosures. Frequently, it is said that the relationship must inspire the disclosure, and that the relationship cannot merely emerge from the revelation's wake." *Reed,* 601 F.Supp. at 715.

The decision of the Second Circuit in *Walton v. Morgan Stanley & Co.,* 623 F.2d 796 (2d Cir.1980) illustrates the required nexus between the confidential disclosure and the fiduciary relationship. In *Walton,* Kennecott Copper Corporation hired the investment banking firm of Morgan Stanley to advise it on the possible acquisition of Olinkraft, Inc. Olinkraft cooperated with Morgan Stanley by providing it with highly confidential earnings projections for the limited purpose of evaluating the proposed acquisition. Although Kennecott ultimately withdrew its offer to acquire Olinkraft, two other corporations made a bid. After announcement of the first bid, Morgan Stanley purchased approximately 150,000 shares of Olinkraft common stock for its own account in the hope that a competing offer would be made at a higher price. Morgan Stanley subsequently disclosed its confidential Olinkraft information to one of its clients in an attempt to induce it to make a higher bid. Ultimately, that corporation made a bid and merged with Olinkraft at a considerably higher price per share. Thereafter, plaintiffs commenced a derivative action on behalf of Olinkraft against Morgan Stanley for breach of fiduciary duty.

The Second Circuit rejected plaintiffs' claim that Morgan Stanley became a fiduciary of Olinkraft simply by virtue of its receipt of the confidential information.

> [T]he fact that the information was confidential did nothing, in and of itself, to change the relationship between Morgan Stanley and Olinkraft's management. Put bluntly, although, according to the complaint, Olinkraft's management placed its confidence in Morgan Stanley not to disclose the information, Morgan Stanley owed no duty to observe that confidence.

*Id.* at 799. The Second Circuit subsequently construed *Walton* to mean that "an investment banker, representing an acquiring company, does not owe a fiduciary duty to the target simply because it received confidential information during the course of tender offer negotiations." *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 14 (2d Cir.1983), *cert. denied sub nom., Moss v. Newman,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *see also Dirks v. SEC,* 463 U.S. 646, 662 n. 22, 103 S.Ct. 3255, 3265 n. 22, 77 L.Ed.2d 911 (1983) (citing *Walton* as "[a]n example of a case turning on the court's determination that the disclosure did not impose any fiduciary duties on the recipient of the inside information....").[5]

Based upon these principles, it is readily apparent that a genuine question of fact exists concerning the nature and scope of the relationship between Litton and Lehman Brothers. It is undisputed that Litton told Lehman Brothers in early November that it was in the process of acquiring a 4.9% interest in Itek and wanted to hire Lehman Brothers as its investment banker

---

**5.** Although Delaware law governed the dispute in *Walton,* the Second Circuit recognized that neither New York law nor any other state's law would warrant a contrary result. *See Walton,* 623 F.2d at 799.

for the Itek acquisition. Under New York law, however, the mere reposal of confidential information will not in and of itself transform an arm's length relationship into a fiduciary relationship. Rather, the confidential relationship must provide the impetus for Litton's disclosure of its confidential plans to acquire Itek. The fact that Litton disclosed confidential information to Lehman Brothers does not change the nature of their relationship, whatever it may have been.

If Lehman Brothers establishes at trial that the parties dealt with each other at arm's length and that Litton simply disclosed confidential information during the course of the arm's length negotiations, Lehman Brothers does not owe any fiduciary duty to Litton. On the other hand, if Litton establishes that it disclosed the confidential information in the context of a confidential relationship that predated the disclosure, Lehman Brothers stands as a fiduciary to Litton. In sum, the issue of whether Lehman Brothers owed a fiduciary duty to Litton as its investment banker is a genuine issue of fact reserved for trial. In making this determination, the trier of fact may consider all factors that bear on the nature and scope of the relationship between the parties.

■■■ Assuming the Court could find as a matter of law that Lehman Brothers owed a fiduciary duty to Litton, an additional question of fact concerning Lehman Brothers' discharge of its duty precludes the entry of summary judgment. A fiduciary is bound by a standard of utmost good faith, fairness and loyalty. *See Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1078 (2d Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978). The New York Court of Appeals has defined the heightened duty of a fiduciary to mean that a fiduciary "is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Cardozo, C.J.). Both parties have cited conflicting deposition testimony re-

garding whether Lehman Brothers implemented adequate policies and procedures for the protection of nonpublic information disclosed by its clients. Thus, assuming the existence of a fiduciary relationship, whether Lehman Brothers has failed to discharge its fiduciary obligations to Litton by not preventing the leak of the Litton/Itek transaction is a question of fact reserved for trial.

■■■ Despite the readily apparent conclusion that there are questions of fact, the Court will briefly consider the vigorous evidentiary attacks put forth by each party since they give rise to yet additional motion practice. Litton relies primarily on the deposition testimony of Saul Cohen, Lehman Brothers' former general counsel. Cohen testified that Lehman Brothers' management failed to take the legal and compliance department seriously and was "reckless" in failing to provide it with the information necessary to monitor securities trading by its employees. *See* Deposition of Saul S. Cohen, at 93, 185, 86 Civ. 6447 (JMC) (S.D.N.Y. Apr. 22, 1988). Cohen concluded that the legal and compliance department would have uncovered Sokolow's and Levine's insider trading if Lehman Brothers had properly monitored employee trading. *See id.* at 81–82.

■■■ Lehman Brothers contends that the Court should not consider Cohen's testimony because its content is protected by the attorney-client privilege and because of Cohen's conceded animus toward Lehman Brothers. Lehman Brothers, however, fails on both counts. First, discrediting testimony because of bias involves a credibility determination that is solely within the province of the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Second, at this stage of the proceeding, the Court finds that Lehman Brothers, as holder of the privilege, has failed to establish that it made confidential communications to Cohen "solely for the purpose of the corporation seeking legal advice and its counsel

rendering it." *In re John Doe Corp.*, 675 F.2d 482, 488 (2d Cir.1982).[6]

Lehman Brothers relies upon a host of deposition testimony to establish that it implemented reasonable procedures to protect the confidentiality of material, nonpublic information disclosed by its clients. *See, e.g.*, Deposition of James C. Morel, at 53–54, 59–61, 86 Civ. 6447 (JMC) (S.D.N.Y. Oct. 20, 1987); Deposition of Wheelock R. Bingham, at 94–95, 116–18, 122–24, 137–39, 86 Civ. 6447 (JMC) (S.D.N.Y. Dec. 2, 1987); Deposition of J. Tomilson Hill III, at 231–33, 239–42, 244–47, 279–82, 86 Civ. 6447 (JMC) (S.D.N.Y. Apr. 4, 1990). Litton also relies upon the reply affidavit of Judith MacDonald, which is the subject of Litton's pending motion to strike. *See infra* Section II.

Accordingly, Lehman Brothers' cross-motion for partial summary judgment to dismiss the fiduciary duty claim for fee damages is granted in part and denied in part. Fed.R.Civ.P. 56. *Litton's motion for partial summary judgment is denied.* Fed. R.Civ.P. 56.

### C. Securities Fraud and Common Law Negligence

Count I of the third amended complaint asserts a claim against Lehman Brothers for violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1988) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Count VII asserts a claim against Lehman Brothers for common law negligence. Since Litton fails to oppose Lehman Brothers' summary judgment motion on these counts, the entry of summary judgment is proper.

### II. *Motion to Strike the MacDonald Affidavit*

Lehman Brothers submitted the affidavit of Judith MacDonald in connection with its reply memorandum of law in further support of its cross-motion for partial summary judgment. At all relevant times, MacDonald was an attorney in Lehman Brothers' in-house legal and compliance department and assisted the investment bank-

ing department with the Itek acquisition. *See* Affidavit of Judith MacDonald, at ¶¶ 2, 5, 86 Civ. 6447 (JMC) (S.D.N.Y. June 15, 1990). Based upon her experience, MacDonald contends that the investment banking department took seriously the firm's compliance policies and procedures. *See id.* at ¶ 4. Moreover, MacDonald claims that the investment banking department regularly advised her of potential corporate transactions that may warrant inclusion of a particular stock on Lehman Brothers' "watch list," a list of stocks maintained by the legal and compliance department which were the subject of nonpublic transactions involving Lehman Brothers. *See id.* at ¶ 3. Placing a stock on the "watch list" enabled the legal and compliance department to monitor trading in that stock of trades executed at Lehman Brothers itself, its clearing firms, or in any outside employee accounts which the employee had disclosed to Lehman Brothers and received permission to maintain. *See id.* at ¶ 8. MacDonald concludes that Lehman Brothers' monitoring procedures could not possibly have detected the alleged insider trading by Levine or Sokolow since they conducted their activities through undisclosed offshore accounts maintained in a fictitious name. *See id.*

Litton moves to strike the MacDonald affidavit on the grounds that it is untimely under Rule 6(d) and not in conformity with the personal knowledge requirement of Rule 56(e) of the Federal Rules of Civil Procedure. Litton's contention that Rule 6(d) renders *reply* affidavits untimely unless filed with the motion they support is plainly without merit. The operative language of Rule 6(d) provides as follows:

> When a motion is *supported* by affidavit, the affidavit shall be served with the motion; and, except as otherwise provided in Rule 59(c) [dealing with a motion for a new trial], *opposing* affidavits may be served not later than 1 day before the hearing, unless the court permits them to be served at some other time.

---

**6.** Should this action proceed to trial, Lehman Brothers is free to file a motion *in limine* to exclude any testimony by Cohen that infringes on the attorney-client privilege.

Fed.R.Civ.P. 6(d) (emphasis added). Clearly, Rule 6(d) addresses supporting and opposing affidavits, and is silent as to the submission of reply affidavits. However, Local Civil Rule 3(c)(2) of this Court expressly provides for the submission of "reply papers" at the option of the moving party at least two days before the return day.

■■■ Where new evidence is presented in a party's reply brief or affidavit in further support of its summary judgment motion, the district court should permit the nonmoving party to respond to the new matters prior to disposition of the motion. *See Black v. TIC Inv. Corp.*, 900 F.2d 112, 114 (7th Cir.1990); *Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1568 n. 9 (11th Cir.1987); *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 409–10 (1st Cir.1985). However, the MacDonald reply affidavit responds to matters placed in issue by Litton in its opposition brief and does not spring upon Litton new reasons for the entry of summary judgment. In its moving papers, Lehman Brothers does not raise the efficacy of its procedures to prevent the misuse of nonpublic information by its employees.[7] It was only in Litton's opposition to Lehman Brothers' motion that Litton relied upon Cohen's deposition testimony to establish a genuine issue regarding Lehman Brothers' in-house compliance system. Clearly, reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party who took it upon himself to argue those previously unforeseen issues. *See Travelers Ins. Co. v. Buffalo Reinsurance Co.*, 735 F.Supp. 492, 495 (S.D.N.Y.), *vacated in part on other grounds*, 739 F.Supp. 209 (S.D.N.Y.1990); *United States v. International Business Machs. Corp.*, 66 F.R.D. 383, 385 (S.D.N.Y.1975).

■■■ Lastly, Litton contends that the MacDonald reply affidavit fails to comply with the personal knowledge requirement of Rule 56(e).[8] Litton's argument is unpersuasive. The mere fact that the MacDonald affidavit uses phrases such as "do not specifically remember," "no reason to doubt," and "cannot believe" does not in and of itself warrant a finding that the affidavit is based on rank speculation. To the contrary, the Court finds that MacDonald has the requisite personal knowledge to satisfy Rule 56(e). The MacDonald affidavit indicates that the statements are based upon her personal knowledge of Lehman Brothers' compliance procedures during the relevant time period. Moreover, the affidavit provides that the basis for MacDonald's personal knowledge is her involvement with Lehman Brothers' investment banking department in connection with the Litton/Itek transaction. *Cf. Kamen v. AT & T*, 791 F.2d 1006, 1011 (2d Cir.1986) (finding that affiant's conclusory statements not based on personal knowledge). Contrary to Litton's bold assertion, the MacDonald affidavit cannot be equated with an affidavit that prefaces each statement with the disclaimer, "Common sense dictates that." *See Brady v. Hearst Corp.*, 281 F.Supp. 637, 642 (D.Mass.1968).

Accordingly, Litton's motion to strike the MacDonald affidavit is denied. Fed. R.Civ.P. 6(d), 56(e); Local Civil Rule 3(c)(2).[9]

---

7. With respect to Litton's claim for breach of fiduciary duty arising wholly independent of the November 23 contract, Lehman Brothers' sole argument in its moving papers is that Litton is not entitled as a matter or law to recovery of its fee under a theory of rescission or forfeiture for services faithlessly performed.

8. Rule 56(e) provides that an affidavit in support of or opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e).

9. Even if Litton could establish that the MacDonald affidavit is not based on personal knowledge, this would not affect the Court's disposition of the cross-motions for summary judgment. As previously illustrated, Lehman Brothers has cited extensive deposition testimony which in the absence of the MacDonald affidavit demonstrates that Lehman Brothers' discharge of its fiduciary duty (should such a duty exist) is a question of fact not amenable to summary judgment.

III. *Final Judgment on the Claims for Tender Offer/Merger Purchase Damages and Disgorgement Damages*

▇ Litton seeks the entry of final judgment or, in the alternative, certification for appeal, on its claims for tender offer/merger purchase damages dismissed by the March 27 Order and the August 4 Order, as well as its claims for disgorgement damages dismissed by the April 18 Order. Rule 54(b) of the Federal Rules of Civil Procedure permits the district court to "direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed.R.Civ.P. 54(b). Of course, application of Rule 54(b) must be tempered by the "historic federal policy against piecemeal appeals...." *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 438, 76 S.Ct. 895, 901, 100 L.Ed. 1297 (1956).

▇ In a multiple party situation where the complaint has been dismissed as to one defendant but not others, the court should not direct the entry of a final judgment "if the same or closely related issues remain to be litigated against the undismissed defendants." *Cullen v. Margiotta*, 811 F.2d 698, 710 (2d Cir.), *cert. denied sub nom., Nassau County Republican Comm. v. Cullen*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). In a case involving multiple claims, Rule 54(b) certification is permissible if the claim in question is separate and distinct from the surviving claims. *See Hudson River Sloop Clearwater, Inc. v. Department of the Navy*, 891 F.2d 414, 418 (2d Cir.1989); *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1203 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990). Claims are deemed separable if they "involve at least some different questions of fact and law and could be separately enforced...." *Cullen*, 811 F.2d at 711. The

mere fact that the claims arise out of the same transaction or occurrence does not preclude a finding of separability. *See id.* (citing *Cold Metal Process Co. v. United Eng'g & Foundry Co.*, 351 U.S. 445, 452, 76 S.Ct. 904, 908, 100 L.Ed. 1311 (1956); *Sears, Roebuck*, 351 U.S. at 436–37 & n. 9, 76 S.Ct. at 900 & n. 9). Rather, in assessing the separability of claims, it is essential to bear in mind that the purpose of the separability requirement is to "avoid redundant review of multiple appeals based on the same underlying facts and similar issues of law." *Hudson River*, 891 F.2d at 418.

The district court must undertake a dual inquiry in all Rule 54(b) determinations. Once the requisite separability of the claims or parties has been established, the court may direct the entry of final judgment only if "there is no just reason for delay." Fed.R.Civ.P. 54(b). In making this determination, the Supreme Court has expressly rejected the limited application of Rule 54(b) to the "infrequent harsh case." *See Curtiss–Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 10, 100 S.Ct. 1460, 1466, 64 L.Ed.2d 1 (1980). The Second Circuit has repeatedly indicated that no just reason for delay exists when there is some danger of hardship or injustice which would be alleviated by immediate appeal. *See, e.g., Cullen*, 811 F.2d at 711; *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 445 (2d Cir.1985); *Brunswick Corp. v. Sheridan*, 582 F.2d 175, 183 (2d Cir.1978). However, a recent pronouncement by the Second Circuit cautions that the factors of hardship and injustice continue to play a role in Rule 54(b) determinations only to the extent that the district court may grant certification in the " 'interest of sound judicial administration.' " *Hudson River*, 891 F.2d at 419 (quoting *Curtiss–Wright*, 446 U.S. at 10, 100 S.Ct. at 1466).[10] This determination is committed to the sound discretion of the district court. *See Curtiss–Wright*, 446 U.S. at 8, 100 S.Ct. at 1465; *Cullen*, 811 F.2d at 711.

---

**10.** In *Hudson River,* the Second Circuit found a sufficient showing of hardship resulting from the inability to immediately appeal the adverse ruling. Therefore, the court declined to decide whether *Curtiss–Wright* eliminated the need to show *some* evidence of hardship to warrant Rule 54(b) certification. *See* 891 F.2d at 419.

## A. Separability

When Litton commenced the instant action, it involved multiple claims and multiple parties. At present, the complaint has been dismissed as to all defendants except Lehman Brothers. The underlying issue is whether the dismissed tender offer/merger purchase damage claims and the disgorgement damage claims are separable from the remaining fee return claim asserted solely against Lehman Brothers for breach of its fiduciary duty. The Court finds that the first prong of Rule 54(b) is satisfied as it is undeniably clear that the adjudicated claims against the dismissed defendants are sufficiently distinct from the one remaining claim against Lehman Brothers, even though all claims arose out of the same transaction or occurrence.

The adjudicated and remaining claims involve different questions of law. The tender offer/merger purchase damage claims turn on the legal issue of whether Litton can establish that the alleged insider trading caused the Itek Board of Directors to raise their valuation of Itek stock, thereby causing Litton to pay more for its tender offer and merger purchases of Itek. The disgorgement damage claims involve the distinct legal issue of whether disgorgement of profits is a viable alternative measure of damages in a private action when defendants have previously disgorged the full amount of their ill-gotten gains to the SEC. These legal questions are simply not implicated in Litton's remaining claim against Lehman Brothers for breach of fiduciary duty.

■ Similarly, the adjudicated and remaining claims involve substantially different questions of fact. Admittedly, there is some factual overlap between the claims insofar as they arise out of the same occurrence—the Litton/Itek transaction—and are predicated in part on the same underlying allegations—that certain defendants stole from Lehman Brothers confidential information about Litton's plans to acquire Itek and illegally traded in Itek stock based upon this confidential information. Lehman Brothers, however, is incorrect as a matter of law in its assertion that this factual overlap precludes Rule 54(b) certification. Claims arising out of the same transaction or sharing certain factual elements may nevertheless constitute separate claims for Rule 54(b) purposes. Despite this minimal factual overlap, the claims in question are by and large factually distinct. Unlike the dismissed claims seeking tender offer/merger purchase damages and disgorgement damages, the factual inquiry concerning the remaining claim for breach of fiduciary duty involves the nature and scope of the relationship between Litton and Lehman Brothers.

## B. No Just Reason for Delay

■ A significant factor in evaluating judicial administrative interests is whether "[an] appellate court would have to decide the same issues more than once even if there were subsequent appeals." *Curtiss–Wright*, 446 U.S. at 8, 100 S.Ct. at 1465. In the event of a subsequent appeal of Litton's claim for breach of fiduciary duty seeking fee damages, the Second Circuit would not have to decide the same issues of law and fact involved in the dismissed claims for tender offer/merger purchase damages and disgorgement damages. In addition, it is evident that resolution of the remaining breach of fiduciary duty claim is not likely to moot the issues sought to be appealed. Lastly, the absence of just reasons for delay is evident from the fact that the action is not currently pending as to all of the parties. As a general matter, "[a]pplication of Rule 54(b) is particularly inappropriate 'when the contestants on appeal remain, simultaneously, contestants below.'" *Consolidated Rail Corp. v. Fore River Ry. Co.*, 861 F.2d 322, 326 (1st Cir. 1988) (quoting *Spiegel v. Trustees of Tufts College*, 843 F.2d 38, 44 (1st Cir.1988)); *accord Brunswick*, 582 F.2d at 183. Although this action initially asserted multiple claims against multiple parties, at present all that remains is one count asserted against one defendant.

In sum, it is in the interest of sound judicial administration not to delay appellate resolution of the separable adjudicated

**1238**

claims.[11] Accordingly, Litton's motion for the entry of final judgment on its claims for tender offer/merger purchase damages and its claims for disgorgement damages is granted. Fed.R.Civ.P. 54(b). Litton's alternative request for certification pursuant to 28 U.S.C. § 1292(b) is denied as moot.

### IV. Final Judgment on the Claims for Open Market Purchase Damages

■ On May 25, 1990, Litton entered into a settlement agreement with BLI and BLZ pursuant to which Litton agreed to dismiss with prejudice its claims asserted against all defendants for recovery of open market purchase damages in exchange for certain payments from BLI and BLZ. The settlement provided that BLI and BLZ would tender payment when the open market purchase damages claims were "finally and conclusively dismissed with prejudice." The parties agreed that such a conclusive dismissal would be established when (1) this Court enters an order dismissing the open market purchase damage claims with prejudice and (2) there is either an affirmance of that order or the expiration of time in which to seek appeal.

Finding that the requested relief would facilitate the ultimate resolution of the litigation, pursuant to Rule 41(a)(2) the Court dismissed with prejudice the claims for open market purchase damages asserted against all defendants. See June 27 Order, at 3–4. Thereafter, Litton requested payment of the settlement proceeds, but BLI and BLZ refused to pay on the ground that the Rule 41 dismissal was not a final judgment within the meaning of Rule 54(b). The parties subsequently amended their settlement agreement to provide for immediate payment of the proceeds to Litton. In light of the dispute concerning the finality of the June 27 Order, Litton, BLI, and BLZ jointly move for modification of the

Order to reflect the entry of final judgment under Rule 54(b).

The traditional purpose of Rule 54(b) is to permit an aggrieved party to obtain immediate appellate review of an adverse partial determination. However, a Rule 54(b) final judgment may also be sought for the purpose of producing res judicata effects in another forum. See Shamley v. ITT Corp., 869 F.2d 167, 170 (2d Cir.1989); Continental Airlines, Inc. v. Goodyear Tire & Rubber Co., 819 F.2d 1519, 1525 (9th Cir.1987). Although Rule 54(b) certification may be sought for purposes other than immediate appellate review, the instant motion clearly exceeds the permissible bounds for entry of partial final judgment. The parties readily concede that the motion is designed to resolve a dispute as to whether BLI and BLZ were required to make certain payments under their settlement agreement, payments that BLI and BLZ subsequently made pursuant to their amended settlement agreement. The Second Circuit has repeatedly cautioned that Rule 54(b) certification should not be made as a courtesy or accommodation to counsel. See, e.g., Burr v. Ambach, 863 F.2d 1071, 1074 (2d Cir. 1988), vacated on other grounds sub nom., Sobol v. Burr, 492 U.S. 902, 109 S.Ct. 3209, 106 L.Ed.2d 560 (1989); Perez v. Ortiz, 849 F.2d 793, 796 (2d Cir.1988); Ansam Assocs., 760 F.2d at 445; Brunswick, 582 F.2d at 113.

Accordingly, the joint motion for the entry of final judgment on Litton's claims for open market purchase damages is denied. Fed.R.Civ.P. 54(b).

### V. Motion to Compel the Deposition Testimony of Dennis Levine

■ The procedural history surrounding Litton's repeated and, thus far, unsuccessful efforts over the past three years to compel Levine's deposition testimony is well documented. In September 1987, Lit-

---

11. Lehman Brothers' contention that law of the case mandates denial of Litton's motion is utterly without merit. The law of the case doctrine fosters judicial economy by preventing relitigation of matters already decided during the course of the action. See C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4478 (1981). Here, however, Litton does not seek to relitigate the Court's denial of defendants' prior Rule 54(b) motion. Rather, Litton brings its own Rule 54(b) motion based on the present, advanced status of the case. Unlike the present situation, the prior Rule 54(b) motion was made at a time when all claims were pending as to all defendants.

ton first moved to compel the deposition testimony of Levine.[12] Magistrate Judge Gershon denied Litton's motion in all respects, rejecting Litton's "incorrectly narrow view of the Fifth Amendment privilege." Opinion and Order, at 11–12, 86 Civ. 6447 (JMC) (S.D.N.Y. Oct. 6, 1988) [the "October 6 Order"]. This Court denied Litton's appeal from that adverse ruling. *See Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F.Supp. 1071, 1079–82 (S.D.N.Y.1990).

In May 1990, Litton filed a "renewed" motion to compel Levine's deposition testimony based upon a recent article written by Levine appearing in the May 21, 1990 issue of *Fortune* magazine, entitled "The Inside Story of an Inside Trader." On August 13, 1990, Magistrate Judge Gershon denied Litton's renewed motion to compel. Having reviewed the *Fortune* article, Magistrate Judge Gershon found that Levine's disclosures did not alter her prior decision that " 'the very conduct with which Litton charges Levine provides a potential basis for various criminal prosecutions.... The limitations of Levine's plea agreement and the remaining potential for criminal prosecution demonstrate that Levine's vulnerability to further prosecution is not imaginary or fanciful.' " Endorsement Order, at 1, 86 Civ. 6447 (JMC) (S.D.N.Y. Apr. 13, 1990) (quoting October 6 Order, at 4). The Magistrate Judge concluded that Levine's statements in the *Fortune* article did not constitute a waiver of his fifth amendment rights nor did they negate his assertion of a reasonable fear of prosecution. Litton now seeks to modify or reverse the denial of its renewed motion to compel the deposition testimony of Levine.

Magistrate Judge Gershon's ruling on this nondispositive pretrial matter can be modified or set aside only if her findings are "clearly erroneous or contrary to law."

28 U.S.C. § 636(b)(1)(A) (1988); Fed. R.Civ.P. 72(a). A finding may be set aside as clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

Broadly stated, the emphasis of the *Fortune* article is on Levine's familial, educational, and investment banking background, his motivations for trading on inside information, his downfall, the impact of his experience in prison, and the rebuilding of his career. Although the article discusses some of the defendants in this action and their role in Levine's insider trading ring, the article does not provide details of any specific transactions. Most significantly, Levine makes no reference to the Litton/Itek transaction.

Litton contends that Magistrate Judge Gershon's ruling is clearly erroneous because Levine's disclosure of previously unknown incriminating facts in the *Fortune* article demonstrates that he has invoked the fifth amendment as a subterfuge to improperly avoid testifying in this action.[13] To substantiate the absence of a genuine fear of prosecution, Litton points to various sections in the article where Levine allegedly admits the essential elements of each offense for which the Court previously determined he might be prosecuted. Levine Brothers, on the other hand, argues that the *Fortune* article is limited to those facts that are a matter of public record as a result of Levine's guilty plea, his allocution, and his sentencing memorandum.

The well established standards for valid invocation of the fifth amendment privilege have been previously delineated by the Court and will not be repeated here. *See* 734 F.Supp. at 1080. Whether or not the article contains any new admissions, it is

---

**12.** Litton originally sought to compel Levine's testimony with respect to four categories of questions: (1) Levine's employment history at Lehman Brothers, (2) Levine's testimony before the United States House of Representatives' Subcommittee on Oversight and Investigations, (3)

the criminal charges to which Levine pled guilty, and (4) the nature of Levine's assets.

**13.** Litton does not challenge Magistrate Judge Gershon's ruling on the ground that Levine's *Fortune* article constitutes a waiver of his fifth amendment privilege.

**1240**

evident that Levine continues to have a reasonable fear of prosecution. Levine may be prosecuted by (1) the State of New York for evasion of state income taxes, (2) the State of New York or any other state for violations of state securities fraud laws, and (3) federal authorities from districts other than the Southern District of New York for offenses including federal securities fraud, mail fraud, and wire fraud. The Court recognizes that voluntary public dissemination of detailed information concerning events for which a witness invokes the fifth amendment privilege may suggest that the privilege is being asserted as a subterfuge to avoid testifying. However, in the instant action, publication of the *Fortune* article does not vitiate Levine's reasonable fear of prosecution.

Litton's reliance on *G.D. Searle & Co. v. Interstate Drug Exch., Inc.*, 117 F.R.D. 495 (S.D.N.Y.1987) to establish that Levine asserted his fifth amendment privilege as a subterfuge is without merit. In *Searle,* the court found that the defendant had no genuine fear of federal prosecution because his plea agreement with the United States accorded "an unusually broad grant of transactional immunity." *Id.* at 501. The court similarly found that the defendant affirmatively disavowed any fear of state prosecution. *See id.* at 503 & n. 5. In this regard, the court noted that the defendant's lack of concern for state prosecution was underscored by his willingness to give nationally broadcast testimony before a congressional subcommittee concerning the precise events to which plaintiff sought deposition testimony without requesting a grant of use immunity. *See id.*

at 505 & n. 10. Contrary to Litton's assertion, however, Levine's *Fortune* article cannot be equated with the congressional testimony by the defendant in *Searle.* Faced with the defendant's attempt to retract his express disavowal of any fear of state prosecution, the *Searle* court concluded that the defendant's nationally broadcast testimony underscored his original disavowal of fear of prosecution. The absence of an affirmative disavowal of prosecution by Levine defeats Litton's reliance on *Searle.*[14]

Litton's repeated protestations that Levine has no realistic fear of prosecution given that it is now eight years after the Itek acquisition and four years after he entered his plea agreement were properly rejected by Magistrate Judge Gershon. As the Court previously recognized, the mere lapse of time does not preclude valid assertion of the fifth amendment privilege. *See* 734 F.Supp. at 1081. In sum, the Court reaffirms its prior finding that the deposition testimony sought could furnish a link in the chain of evidence necessary to prosecute Levine for a host of federal and state crimes. Having found that Levine satisfied the requisite threshold showing of potential incrimination, the Court declines Litton's invitation to speculate upon the likelihood of prosecution. *See Estate of Fisher v. Commissioner*, 905 F.2d 645, 649 (2d Cir.1990); *United States v. Edgerton*, 734 F.2d 913, 921 (2d Cir.1984).

Litton has failed to show that Magistrate Judge Gershon's ruling is in any respect clearly erroneous or contrary to law.[15] Ac-

---

**14.** Litton's reliance on dicta in *Camelot Group, Ltd. v. W.A. Krueger Co.*, 486 F.Supp. 1221 (S.D.N.Y.1980) is indeed curious since the decision lends support to the Court's finding that Levine has a realistic fear of prosecution. In *Camelot*, the district court recognized that the possibility of incrimination is greater where "the civil action is based upon a statute that also provides for criminal penalties," such as the federal securities laws. *See id.* at 1228. Since a civil action for fraud has an "imperfect analog[ ] in the criminal law," the court deemed the witness' apprehension of prosecution to be fanciful. *See id.* at 1229. However, in the instant action, it is undisputed that the precise conduct relied upon to establish Levine's civil liability for fed-

eral securities fraud may also form the basis for a criminal prosecution.

**15.** Litton's request that the Court conduct an *in camera* review of the particularized assertions of privilege is denied. If Litton desired an *in camera* review, it should have made its request to Magistrate Judge Gershon. In any event, contrary to Litton's position, the recent Second Circuit decision in *Estate of Fisher* does not mandate the use of *in camera* conferences. Rather, the Second Circuit noted that *"[w]hen the incriminatory potential of a discovery request is not clear on its face,* an *in camera* conference is consonant with the notion that a witness need not surrender 'the very protection that the privi-

cordingly, Litton's motion to reverse or modify Magistrate Judge Gershon's denial of its renewed motion to compel the deposition testimony of Levine is denied. 28 U.S.C. § 636(b)(1)(A) (1988); Fed.R.Civ.P. 72(a).

## CONCLUSION

Litton's motion for partial summary judgment on its claims against Lehman Brothers for breach of contract and breach of fiduciary duty is denied. Fed.R.Civ.P. 56.

Lehman Brothers' cross-motion for partial summary judgment is granted as to the claims for breach of contract, federal securities fraud, and negligence, but granted in part and denied in part as to the breach of fiduciary duty claim. Fed.R.Civ.P. 56.

Litton's motion to strike the reply affidavit of Judith MacDonald is denied. Fed. R.Civ.P. 6(d), 56(e); Local Civil Rule 3(c)(2).

Litton's motion for the entry of final judgment on its claims for tender offer/merger purchase damages dismissed by the March 27 Order and the August 4 Order and its claims for disgorgement damages dismissed by the April 18 Order is granted. Fed.R.Civ.P. 54(b). The Clerk of the Court is directed to enter final judgment as to the dismissal of these claims.

The joint motion by Litton, BLI, and BLZ for the entry of final judgment on its claims for open market purchase damages dismissed by the June 27 Order is denied. Fed.R.Civ.P. 54(b).

Litton's motion to reverse or modify Magistrate Judge Gershon's denial of its renewed motion to compel the deposition testimony of Levine is denied. 28 U.S.C. § 636(b)(1)(A) (1988); Fed.R.Civ.P. 72(a).

The sole remaining claim for trial is the fiduciary duty claim asserted against Lehman Brothers for fee damages and punitive damages. All pretrial papers must be submitted within sixty (60) days of the filing of this Memorandum and Order. Upon submission of pretrial papers, this action will be placed on the Court's Ready Calendar and may be called to trial on forty-eight (48) hours' notice.

SO ORDERED.

## ORDER ON DENIAL OF REARGUMENT

### August 7, 1991

Defendant's motion for reargument is denied. Local Civil Rule 3(j). Defendant's motion to correct a clerical error in the June 4 Order is granted. Fed.R.Civ.P. 60(a).

### BACKGROUND

Plaintiff Litton Industries, Inc. ["Litton"] retained defendant Lehman Brothers Kuhn Loeb Incorporated (now known as Shearson Lehman Brothers) ["Lehman Brothers"] to provide services in connection with Litton's tender offer acquisition for all the outstanding securities of Itek Corporation.

By Memorandum and Order dated June 4, 1991, the Court granted in part and denied in part Lehman Brothers' motion for partial summary judgment on Counts I, VII, IX, and X of the third amended complaint and denied Litton's cross-motion for summary judgment in its entirety. *See* page 1220 [the "June 4 Order"]. As to the breach of contract claim, the Court determined as a matter of law that the parties did not enter into a contractual relationship until November 23, 1982. Therefore, the Court dismissed Litton's claim that Lehman Brothers had breached its contractual obligations by failing to maintain Litton's confidences on or before November 12, 1982. *See id.* at 1227–1231. Similarly, the Court

---

lege is designed to guarantee' in order to invoke it." *Estate of Fisher*, 905 F.2d at 650 (quoting *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951) (emphasis added)). Although the trial court has discretion in determining whether to conduct an *in camera* review, judicial intervention is necessary if the witness cannot otherwise satisfy his burden of establishing self-incrimination. *See id.* at 650–51. Here, the Court previously found that the incriminatory nature of Levine's responses was readily apparent. *See* 734 F.Supp. at 1081. Therefore, an *in camera* review is not necessary to adequately safeguard Levine's right against self-incrimination.

also dismissed the breach of fiduciary duty count to the extent it alleged that the duty arose from the contract between the parties. *See id.* at 1230–1231. However, to the extent that the complaint asserts a fiduciary duty based on the parties' business relationship independent of their contractual relationship, the Court held that questions of fact concerning the nature and scope of the fiduciary duty precluded the entry of summary judgment. *See id.* at 1231–1234.

Lehman Brothers' now moves to reargue that portion of its partial summary judgment motion seeking dismissal of Litton's precontractual breach of fiduciary duty claim.

## DISCUSSION

 Local Civil Rule 3(j) of the United States District Courts for the Southern and Eastern Districts of New York provides the stringent standard governing a motion for reargument. Pursuant to Local Civil Rule 3(j), on a motion for reargument the moving party shall "set[ ] forth concisely the *matters or controlling decisions* which counsel believes the court has overlooked." Local Civil Rule 3(j) (emphasis added). Thus, in order to prevail on a motion for reargument, the moving party must demonstrate that the court has overlooked controlling decisions that may have influenced the earlier result had they been considered by the court. *See Morser v. AT & T Information Sys.*, 715 F.Supp. 516, 517 (S.D.N.Y.1989); *Adams v. United States*, 686 F.Supp. 417, 418 (S.D.N.Y.1988); *Bozsi Ltd. Partnership v. Lynott*, 676 F.Supp. 505, 509 (S.D.N.Y.1987). Alternatively, the moving party may establish that the court failed to consider "factual matters that were put before the court on the underlying motion." *Ashley Meadows Farm, Inc. v. American Horse Shows Ass'n, Inc.*, 624 F.Supp. 856, 857 (S.D.N.Y.1985). However, Local Civil Rule 3(j) precludes a party from advancing new facts, issues, or arguments not previously presented to the Court. *See Weissman v. Fruchtman*, 124 F.R.D. 559, 560 (S.D.N.Y.1989); *Morgan Guar. Trust Co.*

*v. Garrett Corp.*, 625 F.Supp. 752, 756 (S.D.N.Y.1986). It is improper to present new material "because by definition material that has not been previously presented cannot have been previously 'overlooked' by the court." *Consolidated Gold Fields, PLC v. Anglo Am. Corp. of South Africa Ltd.*, 713 F.Supp. 1457, 1476 (S.D.N.Y.1989).

On reargument, Lehman Brothers contends that as a matter of law Litton cannot obtain forfeiture of the fee paid to Lehman Brothers pursuant to their investment banking contract executed on November 23, 1982 as a remedy for Lehman Brothers' alleged breach of fiduciary duty on November 12, 1982. Assuming *arguendo* the existence and breach of a precontractual fiduciary duty on November 12, 1982, Lehman Brothers asserts that its contract fee is not subject to forfeiture because the contract was executed after the breach.

The June 4 Order does not expressly address the argument that Litton is not entitled to fee damages as a matter of law even if Lehman Brothers owed a fiduciary obligation to Litton independent of the contract and breached that obligation on November 12, 1982. However, it is readily apparent from the June 4 Order that the recovery of fee damages for Lehman Brothers' alleged breach of fiduciary duty—the failure to maintain Litton's confidences—depends upon the nature and scope of the duty proven *at trial.* Once the scope of the duty is determined and the resulting breach is defined, it will be possible to determine whether Lehman Brothers is required to forfeit its compensation for services faithlessly performed within the meaning of *Musico v. Champion Credit Corp.*, 764 F.2d 102, 112–14 (2d Cir.1985).

To say that the Court "inadvertently overlooked" the argument that fee damages are not recoverable as a matter of law suggests that the Court's analysis of the factual issues concerning the nature and scope of the fiduciary duty was a mere exercise in futility. Clearly, the Court would not have undertaken a detailed inquiry of the factual issues implicated by the fiduciary duty claim if in fact Litton

was not entitled to fee damages as a matter of law under any factual scenario. Since the Court previously considered and rejected Lehman Brothers' argument, albeit implicitly, it is not properly before the Court on a motion for reargument.

## CONCLUSION

Defendant's motion for reargument is denied. Local Civil Rule 3(j). Defendant's motion to correct a clerical error in the June 4 Order with respect to Litton's motion to compel the deposition of Dennis Levine is granted. Fed.R.Civ.P. 60(a). The reference to "Lehman Brothers" on page 39 of the June 4 Order is corrected to read "Levine." ■

SO ORDERED.